The warm panel. We pride ourselves on being a hot bench, but this is not exactly what we had in mind. But in any event, we will mellow through it. We have two cases for argument this morning. The first case, number 24-10687, United States v. Cockerell. Mr. Bellman, you are up, sir. Good morning, Your Honors. May it please the Court, Andrew Feldman on behalf of Mr. Quentin Cockerell. There are three issues in this case, and I'm going to start with count 4, the anti-kickback statute conviction. This is a very important appeal for defendants in anti-kickback statute cases. This is the first time that the government has asked this court or any court to affirm an anti-kickback statute conviction based on a payment in return for introducing a sales and marketing professional to a health care provider. Here, a pharmacy. And that's Mr. Cockerell receiving what we call an override payment, which is customary in the industry, ROA 2907 through 08, 2910 through 2912. On May 18, 2015, based on a prescription that Dr. Incy ordered for patient LL. That was a payment to Mr. Cockerell for introducing Steve Bergman to a pharmacy. It's not a payment to induce referrals. It's not a payment for unduly influencing a patient's selection of health care services. Those are the things that are required for a kickback under this circuit's case law in Marchetti and Miles. It wasn't a payment he received for Mr. Bergman exercising undue influence over patient selection of health care services. And neither Mr. Cockerell nor Mr. Bergman were the relevant decision makers here. They simply weren't. There's no evidence Mr. Cockerell ever communicated with Dr. Incy. There is no evidence of any influence that Bergman exerted over Dr. Incy to prescribe the medication to patient LL. This is the payment for the patient with the payment was for introducing Mr. Bergman to the pharmacy, express compounding. It's recommending that pharmacy, not even recommending the pharmacy. It's just an introduction. Something that's called a override, which is customary in the industry of sales and marketing professionals. But the key issue judge is whether or not the payment was for inducing referrals. That is what your honors called the dividing line last week in the call decision, whether or not the payment is for inducing referrals or whether it's for compensating advertisers are engaging in lawful marketing services, which is exactly what's going on here and exactly what was going on in the decisions in both Marchetti. That was a laboratory case, not a pharmacy case and miles, which is an older case, but deals with home health. So those decisions, Marchetti and miles demand such proof. They demand that there is evidence of Bergman or either cockerel, either under an aiding and abetting or conspiracy theory, whatever you want to use, whatever theory the government wants to utilize. That is what is required under this circuit's case law. And now, even better, it's now what's required under the seven circuits case law under a case called Sorensen. As recently as last week, they came to a very similar conclusion, reversing an AKS or anti-kickbacks conviction and quoting this court's decision in Marchetti when it highlighted there must be improper influence and said the court held much of Marchetti's conduct lawful because the prosecution did not show that Marchetti had any special relationship or influence over the relevant decision makers, the doctors responsible for selecting laboratories for patient sample testing. That was a durable medical equipment case in the seventh circuit, but the rationale is the same. It's the same in Sorensen. It's the same in miles. It's the same in Marchetti. It should be the same rationale that the court applies here. The government's response is that this isn't new, that Sorensen doesn't stand for anything new. Even better, great. So what they're saying is that this circuit's decision in miles stands for the same premise in Sorensen. And so taken together, Sorensen and Marchetti only amplify what I've already said, which is that marketing without any undue influence over a patient's selection of health care services is simply insufficient to prove a violation of the anti-kickback statute. That should end the analysis of count four. But if it was just an introduction or a recommendation, how did it get to be over $800,000 in payments? Well, that particular- That's a lot of introductions. That particular count, Your Honor, is a substantive anti-kickback statute count, count four. That payment is $1,723.53. That's the only anti-kickback statute count or conviction that is at issue here. It's that payment on that date, May 18, 2015, based on a prescription from Dr. Incey for patient LL. Is that the money that was paid to the wife? That's the money that was paid to the wife. And I'll address that, too. That is a sideshow. That is a sideshow. The employee, whether or not they're, you know, employees or not, whether or not you dress them up or employees or not, I know that was the issue or one of the issues in Hall from a week or two ago. But that is not the issue that this court needs to address today. And quite frankly, the government made this appeal even more straightforward because they've essentially admitted that Mr. Cockrell was engaged in sales and marketing, not inducing referrals in their closing statement. I'll read from it. He was marketing ROA 3652 through 3653. It doesn't matter that Bergman did some of the marketing ROA 3653. But there is a law against kickbacks for marketing ROA 3708. Of course, there is no such law as kickbacks for marketing. That's the actual dividing line is that you can't have a kickback if you're engaged in marketing. There has to be that predicate undue influence shown. And there's just no undue influence shown. There's just piling of inferences and speculation. Marketing is not criminal. Payments for marketing are not criminal. That's exactly what Miles and Marchetti say. That's exactly what the Seventh Circuit said less than two weeks ago. And it's quite frankly what this court said in Hall, more likely in dicta, but this court did talk about the dividing line and did sort of discuss Marchetti in that context. And there's nothing in Hall that in and of itself forecloses this prosecution. And you're not arguing that, are you? I'm not arguing that Hall forecloses this prosecution because Hall doesn't stand for the premises that I'm talking about. But it does say that, quote, that is the dividing line between lawful and unlawful conduct. And then quotes Marchetti, did the defendant intend to induce referrals, which is illegal? Or did the defendant intend to compensate advertisers, which is impermissible? There's insufficient evidence for a reasonable jury to convict on count four and it should be reversed. So you're saying your position is that all the evidence the government put on could only be inferred to be innocuous evidence, that this jury could not infer undue influence from all the evidence that was presented? I mean, you're saying it was just either for a referral or some other innocuous reason. I'm not putting words in my mouth. I'm just trying to understand it because it gets wonderful when you have a jury trial because that means that you made all these arguments to the judge beforehand. You made them to the jury. We don't have an issue, as far as I know, about improper jury instruction. So that means that the jury was channeled in a direction. And so if it's a full set of evidence, then I'm paying attention that if you say the jury could not, from all the circumstances, infer undue influence given the amount of money. But is that sort of the core of your argument? I'm not dismissing it. I just want to make sure I understand. It's part of the argument. It's a response to that. And the way that I would tee that up, for your honor, is this. That you have to look at count four. And count four deals with Dr. Ince. And Dr. Ince and a payment to Mr. Cockrell's wife on May 18, 2015, for $1,700. That is connected to this introduction to Steve Bergman and this Dr. Dr. Ince. So let's deal with that. That's count four. What they want you to infer is that based on all these other things that have nothing to do with Dr. Ince, had nothing to do with those interactions, that somehow, some way, you should conclude that there was undue influence. It just simply doesn't work that way. Were you trial counsel? I was not. Wonderful Mr. Knox over here was. He's immunized himself from my penetrating question. No, I'm up here. I'll answer whatever questions your honors want. But I think. I'd just like to go right at the person who, you know, stood there tall and made the argument to the jury to tell me where the jury missed the eloquence of the argument. Anyway, not being facetious. No, and I appreciate that, your honor. But I think. But I mean, my serious question is just, whenever we have counsel, and we set this argument on purpose, in a fully jury-tried case, if the argument is insufficient evidence, that's a tall order, and you know that. So I'm just trying to make sure I understand where you can say that the jury impermissibly, impossibly, you know, drew inference. That's what juries do all the time. Where is their direct evidence case? I mean, it's just sort of quintessential. I mean, it's a strong argument. I just want to make sure I'm not missing it. When we read all the evidence that's put on, what is it that you're saying the jury could not have inferred undue influence given this scenario? I'm saying that if you look at that payment on May 18, 2015, dealing with Dr. Insig and dealing with a sales and marketing professional, Mr. Bergman, that you cannot infer anything from that because you would have to have something, right? You'd have to have evidence of meetings between Bergman, Cockrell, the doctor, emails, text messages, trips, something. There is none of that in the record. What there is in the record is some evidence of fishing trips, and we took some doctors to dinner, and there were promotional things, all the types of things that sales and marketers do every day here in the United States. But none of that evidence had anything to do with Bergman or Dr. Insig. So you can't infer anything because there's nothing for a jury to infer, Your Honor. I'm sorry if I'm going circular here, but to me, it's that straightforward. And in these other cases, like Miles and Marchetti, you have the same situation, especially Marchetti, and I was trial counsel in the Marchetti case, but for a different defendant. And there was no evidence in that case, just like in this case, of Mr. Marchetti's interactions with the relevant decision makers. Here, you have no evidence of Mr. Bergman's interactions with the relevant decision maker. You have no evidence of Mr. Cockrell's interactions with the relevant decision maker. And so the government wanting to kind of just tell the court, hey, you should affirm this conviction based on all this bad stuff over here, or stuff that we say is bad over here, that's just not sufficient under Marchetti and Miles in this court's precedence. I see that I have two and a half minutes left on my 15 minutes. Do I have that right? Okay. I want to just briefly address count four, excuse me, count one. Count one is interesting because what happened was the indictment on count one was narrowed in two different ways. One, the object of count one is a 371 conspiracy was narrowed to just include a conspiracy to defraud. So it was no longer a conspiracy to violate the anti-kickback statute. That was taken out as a theory. That was not a theory that went to the jury. And number two, you had a narrowing of the overt acts. So if you look at ROA 2413, the only overt act that is alleged in the indictment, and that's how the jury instructions read that you've got to find an overt act beyond a reasonable doubt as alleged in the superseding indictment, is count four. So count four becomes an essential element of count one. And so for the same reasons, I've argued to your fail. Count one must fail because they didn't prove count four beyond a reasonable doubt. All right. Let me ask you this. I haven't, I will admit at this juncture, I have not read the entire record or looked at portions of it, but when we get, when we get deep into all the evidence that's presented, is there a particular area of the record that you should, we should particularly pay attention to see where the government's deficit is, or is it just your overarching argument that even when you look at the evidence, it just does not compel a proper inference by a jury? So in other words, are you making a cumulative kind of argument? It's both your honor, but I would, I would encourage your honors to look at 2907 through 08, 2910 through 2912, and our opening brief, the citations at pages 14, 15, 16, 17. So 14 through 17, our opening brief. Okay. I'll cede the rest of my time for rebuttal. Thank you, your honor. That's helpful. So, all right. We're here from the government. You have your rebuttal time, sir. All right, Mr. Lang, were you the prosecutor? I was not, your honor. I apologize. I left him back in DC. I tell you, what else, what are things coming to, you know? I'll pass that along. I'm just saying it's just good to have the players here, you know. I don't disagree. Good morning, your honors, and may it please the court. Andrew Lang for the United States. The evidence at Cockrell's trial was more than sufficient to permit the jury to infer that Cockrell aided and abetted the receipt of the kickback underlying count four, and Cockrell was incorrect that reversal on count four would necessarily require reversal on the conspiracy and money laundering counts. Let me start with count four. I think Cockrell's counsel is incorrect on this record and the jury instructions that Cockrell was convicted merely for introducing or for aiding and abetting the introduction of a physician. This case was a fraud from top to bottom. Cockrell was convicted on count one, conspiracy to defraud the United States, because the evidence overwhelmingly established that the entire operation of the Express and our Express pharmacies was fraudulent. The whole point was to make as much money as possible not to treat patients, and there was overwhelming evidence from numerous witnesses that all of the participants in the scheme, very much including Cockrell, had as their sole objective making the most expensive possible formulations of pain creams so that they could bill Tricare for those creams. So Scott Schuster, one of the owners of the pharmacies, for example, testified that the purpose, the reason for being of the pharmacies, was to bill out the highest and be the most profitable. Cockrell was part of the inner reimbursements. He went so far as to bring pre-printed prescription pads from other pharmacies as points of comparison to try to make Express and our Express prescriptions even more expensive, and that whole business, as multiple witnesses testified, including when they were testifying about their guilty pleas, was fueled by kickbacks. There was also evidence directly connecting Cockrell and Bergman to this scheme, Bergman being the marketer who personally induced the prescriptions at issue and count four.  Bergman was not indicted, no, Your Honor. I'm sorry? He was just a witness? That's correct. Yes, that's right, Your Honor. So there was testimony generally that marketers' businesses, including QSpine, Cockrell's business, had sub-marketers or sub-reps, and the sub-reps would get paid a kickback, and then the person who introduced or controlled the sub-rep would also get paid a kickback in the form of this so-called override. Michael Rennell, one of the marketers at trial, testified that Bergman was Quinton's or Cockrell's guy, so Cockrell was responsible for introducing Bergman into the conspiracy and made money every time that Bergman induced prescriptions. The specific prescriptions underlying count four were consistent with this arrangement. Cockrell and Bergman were both paid, Bergman was paid 40 percent of the net revenue on those prescriptions, Cockrell was paid an additional 20 percent, and in fact there was evidence that Cockrell himself personally determined how and how much Bergman got paid after bringing him into the conspiracy. He texted Dustin Rall, one of the co-owners of the pharmacies, this was discussed at pages 3318 to 3319, make Bergman a W-2, pay him 40 percent, and give me a 20 percent override. Let me just check off beyond the witnesses who testified, what was the quality of the other evidence? Do we have text messages, tapes of the bank accounts, etc., etc.? Indeed, there was evidence along all of those lines. The actual text message to which I'm referring is in the record at page 4069. There was photographic evidence of Cockrell and others on private planes taking physicians and other marketers out to vacations and dinners, things of that sort. So yes, there was ample documentary evidence supporting the structure of the scheme. Bergman also agreed that he used the pre-printed prescription pads and that he attended these promotional dinners, that's at pages 2901 and 2904 of the record. And finally, I would note, in response to your honors question, Judge Clement, Dr. Ince was a very significant participant in this overarching scheme. He was responsible for over $800,000 in payments by insurers to express, as your honor pointed out. He was one of only two of Cockrell Associated Doctors who was responsible for that volume of payments. I believe at page 4375 of the record, he was actually listed as the 14th most prolific prescriber of these compounded creams to express over the course of the entire conspiracy. And on one particular day, this was discussed at page 3260 of the record, Dr. Ince by himself prescribed 82 compounded creams just sent to these pharmacies. So I think that's additional circumstantial evidence of the volume of his participation. And of course, the fact that these payments to Cockrell were all disguised through his wife is evidence of concealment, which as we point out in our brief is further evidence of consciousness of guilt. So any evidence as to the value of the creams? I mean, were they valuable or were they just being pushed? Well, there was a fair amount of evidence, not only of how much they billed for, but also how much they cost. That difference was quite substantial. I believe the average reimbursement was in the four digit thousands of dollars. And I believe the average cost was in the hundreds of dollars, but I don't have exactly the statistics in front of me. So there was some evidence that they weren't worthless. They had ingredients that in some cases did things. They were topical analgesics, things like that. But as we discussed, especially with respect to restitution, there was also quite a lot of evidence at trial, including from Dr. Jimenez, that these combinations of ingredients were essentially worthless or nonsensical. It didn't make sense to use these creams topically. It didn't make sense to dose them the way that they were dosed. It didn't make sense to use what were called standing orders at trial, which allowed for the automatic substitution of some compounded creams for others without the intervention of a physician. So the bottom line answer to your Honor's question is, yes, there was some evidence that these ingredients weren't worthless on their face, but the way that they were combined, the way that they were used on these preprinted prescription pads didn't make any medical sense. And I think that was consistent with all the testimony about the operation of the pharmacies being, in essence, a fraud. I'm also happy to talk a little bit about Marchetti and Sorenson. So we agree, of course, that Marchetti draws a very clear line between marketing and improper inducement. But this case is very much on the inducement side of that line. Marchetti, at least in the first half of the sufficiency challenge, criticized the government's evidence for offering, quote, not a drop of color as to what the actual influence on the decision makers consisted of. So this court made very clear, of course, that there has to be not only marketing or advertising or recommending, there has to be influence on people making health care decisions. In this case, by contrast, there was a rainbow of color regarding exactly what that influence looked like. There was testimony about doctors getting paid on the back end through these so-called managed service organizations. And indeed, there was testimony that Cockrell was the MSO guy. That's at page 3341 of the record from Turner Luke Zetius, one of the other marketers. So that was a mechanism through which doctors could get paid on their own prescriptions. And there was evidence, as I mentioned earlier, of these vacations, dinners, things like that. So there was quite a bit of evidence in this case, very much unlike in Marchetti or in Sorensen, that the decision makers, the people actually writing these prescriptions and crucially sending them to the pharmacies, were indeed being improperly influenced. I'm also happy to talk about count one. I think my opposing counsel is incorrect that reversal of count four, which of course we don't believe is warranted on this record, would necessarily require reversal on count one. And that's for the simple reason that an overt act in a 371 conspiracy need not itself be criminal. Similarly, on count eight, as we explain in our brief, the volume of the payments on count four by itself couldn't even have supported the conviction on count eight. So the specified unlawful activity underlying that money laundering conviction included the conspiracy. What did the defense of the case consist of? I'm assuming that Cockrell nor the major defendants did not testify. Is that correct? I believe that's correct. The defense case, if the court will indulge me for a moment, consisted, I believe, of a physician who testified that his prescriptions of pain creams were consistent with best practices, as well as a financial analyst who reviewed some of the pharmacy's billing data. And I think it's fair to say, at least with respect to count four, although my opposing counsel can correct me, I think that the theory of the defense was fairly similar to the theory of defense being advanced on appeal, that there wasn't enough evidence directly connecting Cockrell, Bergman, and Dr. Ince. Of course, the last thing that I would say about that is, as Your Honor pointed out, the standard of review on appeal for sufficiency challenges is indeed quite rigorous, and this court must view the evidence and make all inferences in the light most favorable to the verdict. And I think applying that standard of review, reversal is unwarranted on this record. We don't have an issue about jury instructions, at least all these cases running across my head. We have so many criminal cases on this docket, but I don't remember any issue about jury charges, right? That's correct. Certainly not on appeal. Not on appeal. So, though the kickback, or at least I learned a lot in the Hall case about compound pharmacy and it being sort of a mecca for this kind of thing, but anyway, that having been said, there's no argument on appeal that somehow the jury was derailed in terms of what the kickback statute says, et cetera, et cetera. So, we've got a straight-up challenge to the sufficiency of the evidence, for the most part, at least, and that's what counsel argued. I just want to make sure there's not something embedded that, you know, got us in terms of navigating between Marchetti and Hall and the other cases that may be legal. Exactly. I agree with that, Your Honor. I understand this to be a straightforward sufficiency challenge, and I don't read Cockrell's brief or his argument this morning as having anything to do with the content of the jury instructions, unlike, of course, in Hall. I'm happy to talk about the statements that Cockrell identifies in the prosecutor's closing and rebuttal arguments. I'm also, of course, more than happy to talk about restitution. Unless the Court has questions on those topics, I'm happy to submit on our brief, and absent those questions, we ask this Court to affirm. Well, there was no hearing to offset the restitution, right? So, there was no separate restitution hearing, but I do want to be very clear about the procedural history of restitution, because I understand Cockrell's argument in his brief to really be a procedural objection to his supposed inability to offer an offset. So, as we lay out in our brief, there was a great deal of briefing and argument regarding restitution prior to and during the sentencing hearing, starting, I think, with the objections to the pre-sentence investigation report. So, Cockrell did amply brief the issue of restitution, and I think it's fair to say his argument prior to and during the sentencing hearing was restitution should either be limited to the count four prescriptions, or it should be zero, because, as his argument went, the government has failed to meet its burden that the entire operation was fraudulent, all of the prescriptions were illegitimate. The District Court, quite rightly, based on the trial evidence, rejected that argument. The District Court said, okay, I understand your argument, but if I find, and I so that the entire operation was illegitimate, how do I offset that with legitimate prescriptions? And, at that point, Cockrell's counsel acknowledged, we haven't broken that out, I don't have an offset. So, the District Court correctly applied this Court's burden-shifting framework. The Court correctly relied on the trial evidence, which I've summarized a few minutes ago, to hold that the entire operation of these pharmacies was illegitimate, that all of the federal insurers constituted a reimbursable loss, and, as Cockrell acknowledged at sentencing, he didn't show that that loss should be offset by any legitimate prescriptions. With that having been said, we ask this Court to affirm. All right. Sir? Thank you. Back to you, Mr. Feldman. Thank you, Your Honors. So, it is a sufficiency-of-the-evidence challenge, but, as Cooper says from the Fifth Circuit, assessing the sufficiency of the evidence requires determining what conduct constitutes an offense, which is a question of statutory interpretation, reviewed de novo, and that's exactly what we have here. But I also want to focus very quickly on the issues that were raised with respect to count four, which is the question of by my opposing counsel, and this is exactly the problem. This is the United States government that has tremendous resources. If they could, they would actually point to some evidence dealing with Dr. Ensi, Mr. Cockrell, and Mr. Bergman. They can't do it. They haven't pointed to any evidence of inducing referrals, any evidence of improper influence as it relates to those three people. That's count four. So, what, instead, they keep doing is they talk about things like MSOs and the MSO guy or trips and dinners. Is there any evidence in the record that there was an MSO involving Dr. Ensi and Bergman and Cockrell? No. And they needed a smoking gun? Is that what you're saying? It's not a smoking gun, Your Honor, under the circumstances. It's just any evidence. And they needed direct evidence? Because that's what it sounds like you're arguing. They need some evidence to show, to demonstrate to a rational jury beyond a reasonable doubt that Mr. Bergman or Mr. Cockrell exerted the type of undue influence that's required under these circuits presidenced by Miles and Marchetti. The jury has all of this, the money, et cetera, et cetera. That's why I just asked them, what was the defense case? You don't own it. So, we don't have a jury choice. It's sufficiency. So, it's all in. It's not a guilty plea. And we're talking about withdrawal. We're talking about a fully tried jury case. So, you just have to help us understand how the jury properly and impound impermissibly true inferences of undue influence based on what's the case. I'm not asking you to agree with what they did, but it's just a tough hurdle and that's part of oral argument. Help us to understand how to get there. Point me to the record, or something other than just argument. Sure. I would point you to the same things we pointed to before in sections 2907 through 2912 where they talk about, and Mr. Bergman talks about subject to perjury on cross and direct examination, what that relationship looked like. And that he was a marketer engaged in marketing services which are permissible under Marchetti and Miles. But going to this inference- Why isn't the 800,000 plus in payments that went to Express that were related to Dr. Ensi's prescriptions. They didn't go to Cockrell. This money didn't go to Cockrell individually, but the money went to Express related to Dr. Ensi's prescriptions. And why couldn't a jury look at that? Why wouldn't that be sufficient for them to conclude there was impermissible influence? I mean, they have to look at some facts first. Just the fact that a doctor is prescribing a high volume, as the government says, amount of compounded medications without actually looking at what the relationship is or any evidence of the relationship between Mr. Bergman and Dr. Ensi. Between Mr. Bergman, Dr. Ensi, and Mr. Cockrell, other than just the structure of payments. So that's the problem, Your Honor, that we keep focusing on, oh, there's a lot of money from the pharmacy. The pharmacy got paid a lot of money. That $800,000, by the way, that was the subject of the letter that the government submitted rightfully about $800,000 was paid total by the pharmacy, not associated with Mr. Cockrell. But the argument is the same. So we have money, we have these different trips that they've talked about, these MSO arrangements, and they want you to look at the fact that this was a big scheme that involved fraudulent conduct. That's count one, right? And that these medications were reimbursing at a very high level, and they included all these ingredients that are medically unnecessary. Let's say that all of those things were true for a second. That does not alter the analysis that Your Honor should engage in under the Fifth Circuit case law in Miles v. Marchetti and in Seventh Circuit v. Sorensen about inducing referrals. There has got to be some evidence of exertion of improper influence. And just because a doctor prescribes medications that are reimbursing at a high level, $800,000 goes to the pharmacy, does not mean and should not lead a rational jury to infer, beyond a reasonable doubt, that someone was paid to induce referrals. Especially when the sales and marketing professional, Steve Bergman, who is the government's witness, testifies that he was that these payments were for a legitimate versus an illegitimate reason. So we believe that counts four, one, and eight should be reversed. The restitution order should be vacated, and in the alternative, a new trial should be granted because of the statements made during closing statement. Thank you, Your Honors. All right. Thank you, Mr. Feldman. Thank you, counsel, for presenting the case in brief and argument. Thank you for the government. It's a full record. We'll read every word of it, and we'll get the case decided. The case will be submitted. All right. We'll call up our second case.